**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DEAN WILLIAMSON, derivatively on behalf of EQUINIX, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES J. MEYERS, ADAIRE FOX-MARTIN, NANCI CALDWELL, GARY HROMADKO, THOMAS OLINGER, CHRISTOPHER PAISLEY, SANDRA RIVERA, FIDELMA RUSSO, PETER VAN CAMP, JEETU PATEL, THOMAS A. BARTLETT, KEITH D. TAYLOR, SCOTT G. KRIENS, WILLIAM K. LUBY, and IRVING LYONS, III,<br><br>Defendants,<br><br>-and-<br><br>EQUINIX, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC VERSION** |

**VERIFIED STOCKHOLDER**
**CLASS ACTION AND DERIVATIVE COMPLAINT**

Plaintiff Dean Williamson ("**Plaintiff**"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant Equinix, Inc. ("**Equinix**" or the "**Company**"), against Defendants Charles J. Meyers ("**Meyers**"), Adaire Fox-Martin ("**Fox-Martin**"), Nanci Caldwell ("**Caldwell**"), Gary Hromadko ("**Hromadko**"), Thomas Olinger ("**Olinger**"), Christopher Paisley ("**Paisley**"), Sandra Rivera ("**Rivera**"), Fidelma Russo ("**Russo**"), Peter Van Camp ("**Van Camp**"), Jeetu Patel ("**Patel**"), Thomas A. Bartlett ("**Bartlett**"), Keith D. Taylor ("**Taylor**"), Scott G. Kreins ("**Kriens**"), William K. Luby ("**Luby**"),

and Irving Lyons, III ("**Lyons**") (together, the "**Individual Defendants**"), who are current and former members of the Company's Board of Directors (the "**Board**") and its executive officers, for violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "**Exchange Act**") and Rule 14a-9 promulgated thereunder between at least May 3, 2019, and March 24, 2024, inclusive (the "**Relevant Period**"), breaches of fiduciary duties, insider trading, and unjust enrichment. The Individual Defendants and the Company are sometimes referred to herein as "**Defendants**."

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his attorneys, which included, among other things, a review of publicly available documents, filings with the United States Securities and Exchange Commission ("**SEC**"), press releases published by and regarding Equinix, legal filings, news reports, securities analysts' reports about the Company, including the Hindenburg Report (as defined herein), the securities class action captioned *Uniformed Sanitationmen's Association Compensation Accrual Fund v. Equinix, Inc., et al*., Case No. 3:24-cv-02656-VC (N.D. Cal.) (the "**Securities Class Action**"), 19,660 pages of books and records produced by the Company in response to Plaintiff's demand under 8 *Del. C.* § 220 ("**Section 220**"), and other publicly available information.

**<u>SUMMARY OF THE ACTION</u>**

1. Equinix describes itself as a digital infrastructure company that operates interconnected data centers around the world. In 2015, the Company converted into a real estate investment trust ("**REIT**").

2. As of April 2024, the Company owned and operated 260 data centers housing large scale computer systems and maintained operations in 33 countries. The Company's "colocation"

data center offerings provide the components required by customers to house their IT infrastructure or equipment, including space, power, cooling, internet bandwidth, and physical security. Customers, meanwhile, typically provide their own servers and computer hardware to be housed in Equinix's data centers. For the quarter ended September 30, 2024, Equinix derived nearly 70% of its total revenues from colocation offerings.

3. The Company also provides "interconnection" solutions to customers, designed to connect businesses directly, securely and dynamically within and among Equinix's data centers across its global platform. For the quarter ended September 30, 2024, Equinix derived approximately 17.4% of its total revenues from its interconnection and data exchange offerings.

4. As is common in the REIT industry, Equinix reports its quarterly and annual results using Generally Accepted Accounting Principles ("**GAAP**") and various non-GAAP financial measures. Non-GAAP reporting measures reported by Equinix include funds from operations ("**FFO**") and adjusted funds from operations ("**AFFO**"), as well as AFFO per share (sometimes referred to as "**AFFO/Share**").

5. One key metric to the Company's AFFO methodology is the treatment of capital expenditures, often referred to as "**CapEx**."

6. One form of CapEx is "**Recurring CapEx"** (also referred to "**Maintenance CapEx**"). This term describes the ongoing investments that a company makes to sustain its current level of operations; for example, repairing or replacing existing assets such as machinery, buildings, or equipment to prevent deterioration and maintain productivity. An example of Recurring CapEx is replacing a burned-out light bulb. Expenses classified as Recurring CapEx are deducted from and therefore reduce AFFO.

7. Recurring CapEx contrasts with "**Non-Recurring CapEx**" (also referred to as "**Growth CapEx**" or **"Expansion CapEx**"), which includes expenditures aimed at increasing capacity, entering new markets, or upgrading infrastructure. An example of Non-Recurring CapEx is constructing a new data center. In contrast to Recurring CapEx, Non-Recurring CapEx is not deducted from AFFO.

8. AFFO is typically calculated as FFO minus Recurring CapEx (along with other adjustments like straight-line rent or normalized leasing costs). This subtraction accounts for the cash outflows required to maintain the REIT's portfolio, providing a more accurate picture of distributable cash flow. Accordingly, mischaracterizing Recurring CapEx as Non-Recurring CapEx allows a REIT to avoid deducting those expenses from the AFFO formula, resulting in higher AFFO figures.

9. Higher AFFO figures suggest greater cash available for dividends, reinvestment, or debt service, potentially leading to overstated valuations (*e.g.*, via higher price-to-AFFO multiples) or misleading perceptions of financial health.

10. For example, if a REIT incurs $10 million in annual Recurring CapEx but falsely labels it as "Non-Recurring CapEx," AFFO would be reported $10 million higher than if the expense were properly classified, boosting per-share metrics and appealing to investors focused on yield.

11. Therefore, the classification of capital expenses as either Recurring or Non-Recurring has a direct impact on the amount of AFFO reported to the market.

12. During the Relevant Period, the Individual Defendants caused the Company to engage in a scheme by which Recurring CapEx was misclassified as Non-Recurring CapEx,

thereby inflating Equinix's AFFO and AFFO/Share metrics, and causing the Company's financial reports to be materially misleading.

13. Compensation considerations motivated the Individual Defendants' misconduct. As detailed herein, Equinix's executive compensation was explicitly tied to AFFO/Share targets, creating a direct incentive for manipulation. Simply stated, limiting Recurring CapEx entries on the books inflated AFFO, and higher AFFO translated into greater compensation. For example, missing AFFO targets by >5% could zero out bonuses, while meeting or beating them unlocked millions of dollars in bonuses.

14. The truth exposing Defendants' scheme was revealed to the market through gradual public disclosures.

15. On March 20, 2024, investment research firm and admitted short-seller *Hindenburg Research* released a report titled *Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling An AI Pipe Dream As Insiders Cashed Out Hundreds of Millions* (the "**Hindenburg Report**").[1] The Hindenburg Report asserted that Equinix manipulated its accounting for AFFO by misclassifying its Recurring CapEx as Non-Recurring CapEx, giving the appearance that the Company's cost to maintain its revenue base was lower than it actually was.

16. The Hindenburg Report put forth numerous, detailed instances of accounting manipulation by Equinix and its insiders (the "**Hindenburg Allegations**"), which include, among others, the following:

[1] HINDENBURG RESEARCH, *Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling An AI Pipe Dream As Insiders Cashed Out Hundreds of Millions,* (Mar. 20, 2024), https://hindenburgresearch.com/equinix/.

a. Defendants' systematic manipulation started after the Company's conversion to a REIT in 2015, with Recurring CapEx dropping 47% that year, artificially boosting AFFO by 19%.

b. Defendants' manipulation involved reclassifying routine expenses like battery replacements, light bulb upgrades (*e.g.*, changing fluorescent to LED), and refurbished equipment as "growth" items when they should have been classified as recurring.

c. Defendants manipulated the Company's AFFO metric by at least 22% in 2023, through misclassifying Recurring CapEx as Non-Recurring CapEx, leading to a cumulative $3 billion overstatement since its 2015 REIT conversion.

d. Defendants shifted expenses from operating expenses ("**OpEx**") to CapEx to inflate profitability, in contrast with the Company's competitor, Digital Realty, which ceased similar practices in 2013 in order to comply with GAAP.

e. Former Company employees described tactics such as obtaining new serial numbers for old chillers or bundling small costs to meet capitalization thresholds.

f. Former Company employees related how management applied undue pressure: "There's every incentive to categorize as much as you can as expansion [growth] CapEx," and creative wording of projects to qualify as improvements; and

g. Insiders sold a total of approximately $476 million in stock since the Company's conversion to a REIT.

17. Following the publication of the Hindenburg Report, the Company's stock price declined from a close of $844.58 on March 19, 2024, to a close of $824.88 on March 20, 2024.

18. On March 25, 2024, Equinix issued a press release announcing that the Board's Audit Committee commenced an independent investigation to review the matters referenced in the

Hindenburg Report. The Company also announced that, shortly after the release of the Hindenburg Report, Equinix received a subpoena from the U.S. Attorney's Office for the Northern District of California.

19. On May 8, 2024, the Company issued a press release announcing, among other things, that the Audit Committee's investigation was substantially completed and that the Audit Committee "did not identify any accounting inconsistencies or errors requiring an adjustment to, or restatement of, previously issued financial statements or non-GAAP measures." The press release also informed investors that on April 30, 2024, Equinix received a subpoena from the SEC.

20. On May 9, 2024, the Company announced that it had added a new category of Non-Recurring CapEx to its disclosures, referred to as "**Redevelopment CapEx**," to track investments in certain data centers that had been operating for 20 years or longer. Redevelopment CapEx, however, does not reduce AFFO.

21. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Meyers and Taylor on May 2, 2024. On January 6, 2025, the Court in the Securities Class Action denied in part and granted in part defendants' motion to dismiss (Securities Class Action, ECF No. 67). The Court found that the amended complaint "raises a strong inference that Equinix misclassified routine recurring capital purchases—like chillers, batteries, and lightbulbs—as non-recurring to artificially inflate its AFFO numbers in a way that misled investors." *Id.* at 8. The Court further held that the Securities Class Action complaint had "created a strong inference of scienter." *Id.* at 10. The amended complaint contained "particularized allegations that Meyers and Taylor had 'actual access to the disputed information' because they repeatedly discussed capital expenditures and commented on the reasons why AFFO was high and recurring capital expenditures were low." *Id.* at 9.

22. On July 15, 2025, the parties to the Securities Class Action filed a motion for preliminary approval of a settlement for $41,500,000 on behalf of investors who purchased or otherwise acquired Equinix common stock during the class period from May 3, 2019, through March 24, 2024, inclusive.

23. As of July 24, 2025, regulatory investigations against Equinix, including those by the SEC and U.S. Attorney for the Northern District of California, remain pending.

24. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying classwide damages in the Securities Class Action equal to $41.5 million, as well as additional losses, including reputational harm and loss of goodwill. In addition, the proprietary non-public adverse information on which certain Individual Defendants relied when selling shares of Equinix stock during the Relevant Period was an asset of the Company, which these Individual Defendants misappropriated for their own personal financial gain.

25. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and not being disinterested and/or independent, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company in good faith. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

27. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

28. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Equinix is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## THE PARTIES

***Plaintiff***

30. Plaintiff Dean Williamson is, and has been at all relevant times, a shareholder of Equinix. Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting its rights.

***Nominal Defendant***

31. Nominal Defendant Equinix is a Delaware corporation with its principal executive offices located at One Lagoon Drive, Redwood City, California 94065. Equinix's common stock trades on the Nasdaq Stock Market under the ticker symbol "EQIX.

***Individual Defendants***

32. Defendant Meyers has served as a member of the Board since September 2018 and as Executive Chairman since June 2024. Defendant Meyers previously served as CEO and President of the Company from September 2018 to June 2024. As set forth in the proxy statement filed by the Company on April 12, 2024 (the "**2024 Proxy**"), Defendant Meyers received $23,927,452 in compensation from the Company in 2023. During the Relevant Period, while in possession of material and nonpublic information, Defendant Meyers sold 149,933 shares of Equinix common stock for total proceeds of more than $107 million. Defendant Meyers is also named as a defendant in the Securities Class Action.

33. Defendant Fox-Martin has served as the Company's CEO and President since June 2024 and has served as a member of the Board since January 2020. Defendant Fox-Martin also serves as a member of the Board's Stock Award Committee. Prior to becoming CEO, she served as a member of the Board's Nominating and Governance Committee. According to the 2024 Proxy, Defendant Fox-Martin received $334,663 in compensation from the Company in 2023. The 2024 proxy further stated that Fox-Martin is not "considered to be an independent director in connection with her planned succession to the role of chief executive officer and president" of the Company.

34. Defendant Caldwell has served as a member of the Board since December 2015. Defendant Caldwell also serves as Chair of the Board's Nominating and Governance Committee and as a member of the Talent, Culture and Compensation Committee (the "**Compensation Committee**"). According to the 2024 Proxy, Defendant Caldwell received $357,163 in compensation from the Company in 2023.

35. Defendant Hromadko has served as a member of the Board since June 2003. Defendant Hromadko also serves as Chair of both the Finance Committee and the Real Estate

Committee, and as a member of the Nominating and Governance Committee. According to the 2024 Proxy, Defendant Hromadko received $377,163 in compensation from the Company in 2023. During the Relevant Period, while in possession of material and nonpublic information, Defendant Hromadko sold 29,702 shares of Equinix common stock for total proceeds of over $24 million.

36. Defendant Olinger has served as a member of the Board since January 2023. Defendant Olinger also serves as a member of the Board's Audit Committee, Finance Committee, and Real Estate Committee. According to the 2024 Proxy, Defendant Olinger received $438,459 in compensation from the Company in 2023.

37. Defendant Paisley has served as a member of the Board since July 2007 and as Lead Independent Director since February 2012. Defendant Paisley also serves as Chair of the Board's Audit Committee and as a member of the Nominating and Governance Committee, Finance Committee, and Real Estate Committee. According to the 2024 Proxy, Defendant Paisley received $413,163 in compensation from the Company in 2023. During the Relevant Period, while in possession of material and nonpublic information, Defendant Paisley sold 2,700 shares of Equinix common stock for total proceeds of over $1.8 million.

38. Defendant Rivera has served as a member of the Board since October 2019. Defendant Rivera also serves as Chair of the Compensation Committee and as a member of the Stock Award Committee. According to the 2024 Proxy, Defendant Rivera received $344,663 in compensation from the Company in 2023.

39. Defendant Russo has served as a member of the Board since June 2022. Defendant Russo also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Defendant Russo received $339,663 in compensation from the Company in 2023.

40. Defendant Peter Van Camp served as Special Advisor to the Board from June 2024 to June 2025. He served as a member of the Board from May 2000 until June 2024. Defendant Van Camp previously served as CEO of the Company from 2000 to 2007 and as interim CEO and President from January 2018 to September 2018. According to the 2024 Proxy, in fiscal year ("**FY**") 2023, Defendant Van Camp received compensation from the Company equal to "$400,000 in salary and 75% of his salary in annual incentive compensation (paid in fully vested [restricted stock units ("**RSUs**")], and was granted 1,397 RSUs, with the same service and performance vesting requirements as those granted to our named executive officers," for his service as Equinix's executive chairman. During the Relevant Period, while in possession of material and nonpublic information, Defendant Van Camp sold 17,017 shares of Equinix common stock for total proceeds of over $11.4 million.

41. Defendant Bartlett served as a member of the Equinix Board from April 2013 until July 29, 2021. He was a member of the Audit Committee during his tenure. According to the 2022 Proxy Statement, Bartlett received $305,547 in total compensation from the Company in 2021.

42. Defendant Patel served on the Board starting in June 2022 and notified the Board on March 25, 2025, that he would not seek reelection. His departure became effective at the Company's 2025 annual shareholder meeting in May 2025. He was a member of the Compensation Committee at all relevant times. According to the 2024 Proxy Statement, Patel received $336,163 in total compensation from the Company in 2023.

43. Defendant Taylor has served as the Company's CFO since 2005. According to the 2024 Proxy, Defendant Taylor received $11,642,804 in compensation from the Company in 2023. During the Relevant Period, while in possession of material and nonpublic information, Defendant

Taylor sold 54,287 shares of Equinix common stock for total proceeds of over $39.6 million. Defendant Taylor is also named as a defendant in the Securities Class Action.

44. Defendant Kriens was a Company director from July 2000 to June 2020. During his tenure on the Board, he served as a member and chair of the Nominating and Governance Committee and a member of the Compensation Committee. Based on information in the Company's 2020 Proxy, he earned over $358,000 as director in 2020.

45. Defendant Luby was a Company director from February 2007 to May 2021. During his tenure on the Board, he served as a member and chair of the Nominating and Governance Committee and the Compensation Committee. Based on information in the Company's 2020 Proxy, he earned over $337,000 as director in 2020.

46. Defendant Lyons was a Company director from February 2007 to May 2023. During his tenure on the Board, he was a member of the Audit Committee and Compensation Committee. Based on information in the 2023 Proxy, he earned over $385,000 as a director in 2023.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

47. By reason of their positions as officers and/or directors of Equinix, and because of their ability to control the business and corporate affairs of Equinix, the Individual Defendants owed, and in the case of the Individual Defendants who are still officers and/or directors of the Company, continue to owe, Equinix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Equinix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Equinix and its shareholders.

48. Each director and officer of the Company owes to Equinix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

49. To discharge their duties, the officers and directors of Equinix were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Equinix were required to, among other things:

a. Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Equinix's own Code of Business Conduct (the "**Code of Conduct**");

b. Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. Remain informed as to how Equinix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d. Establish and maintain systematic and accurate records and reports of the business and internal affairs of Equinix and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e. Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Equinix's operations would comply with all

applicable laws and Equinix's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f. Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h. Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

**EQUINIX'S CODE OF CONDUCT**

50. Equinix's Code of Conduct begins with a joint letter from Defendants Fox-Martin and Meyers stating that the Company's "adherence to the highest ethical standards reflects the caliber of our people and the strength of our culture." The Code of Conduct applies to every Equinix officer, director, and employee. Employees who violate the Code of Conduct are subject to "disciplinary action up to and including termination of employment."

51. With respect to "Conflicts of Interest," the Code of Conduct provides, in relevant part:

> Each of us has an obligation to do what is right for Equinix. This means avoiding situations that create–or even appear to create–a conflict between our own personal interests and the Company's interests. A conflict of interest is anything that impedes objectivity or effectiveness in our job performance or decisions we make on behalf of Equinix. Transparency is essential to avoiding conflicts of interest.

52. The Code of Conduct further contains a section titled "Our Commitment to the Law," stating, in relevant part:

> Being an ethical and honest company also means obeying the law. As a global company, we must comply with the laws in all the places we do business. And as Equinix employees, we are responsible for understanding and complying with all laws and regulations that affect our jobs.

53. With respect to inside information and securities trading, the Code of Conduct states:

> You must not buy or sell Equinix stock if you possess any "material information" about the Company that has not been publicly disclosed (also known as "inside information"). Similarly, if you are aware of inside information about other companies, such as customers or vendors, you must not buy or sell the securities of that company. If you share inside information or provide insider "tips" to a third party who then trades on that information, you may be held responsible for the illegal trade. You may also be liable for trades made by someone else based on confidential information you shared with an outside party–including family members and friends. If you share inside information that influences a family member or friend to buy or sell Equinix stock, you may be criminally liable as a "tipper" under federal securities laws.

## SUBSTANTIVE ALLEGATIONS

54. On January 1, 2015, Equinix converted from a "C Corporation" to a REIT for federal income tax purposes and began reporting various non-GAAP measures to its investors, including FFO and AFFO.

55. FFO is a key financial metric used primarily in the analysis of REITs. It is calculated as net income (under GAAP) plus depreciation and amortization expenses, minus any gains (or plus losses) from property sales. FFO is designed to measure a REIT's operational cash flow by excluding non-cash items like depreciation, which do not reflect actual cash outflows in real estate. This metric helps investors assess the cash generated from core business activities, such as leasing and property management.

56. AFFO represents FFO excluding depreciation and amortization expenses on non-real estate assets, accretion stock-based compensation, restructuring charges, impairment charges, transaction costs; as well as an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment; and amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax; and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items.

57. Capital expenditures deemed *Recurring* are subtracted from FFO in calculating AFFO, while capital expenditures deemed *Non-Recurring* are not subtracted.

58. Ultimately what a REIT reports as AFFO is a function of classifying capital expenditures as either Recurring or Non-Recurring.

59. In the same financial year that Equinix converted to a REIT (2015), Equinix's reported Recurring CapEx dropped by 47% to $120.3 million, representing 4.4% of total revenue:




(Source: Equinix Earnings Releases & Annual Reports)

60. Underreporting Recurring CapEx was achieved by misclassifying routine, ongoing costs (such as end-of-life equipment replacements for chillers, batteries, and sprinklers) as Non-Recurring or growth-oriented expenditures. This intentional misclassification inflated AFFO by avoiding deductions in the metric's calculation.

61. For instance, the 2015 47% drop in Recurring CapEx resulted in a 19% increase in reported AFFO. In short, Recurring CapEx and AFFO are inversely related: incurring lower Recurring CapEx expenditures results in higher AFFO.

***AFFO Compensation Evolution***

62. In 2015, Equinix replaced *adjusted EBITDA* with *absolute AFFO* as a key performance metric in both its executive annual incentive plan and long-term incentive performance awards, such as performance-based restricted stock units. This change purportedly aligned incentives more closely with REIT-specific cash flow measures after the Company's REIT conversion, weighting AFFO at 50% of the annual incentive plan ("**AIP**") (alongside revenue at 50%) and incorporating it into long-term goals focused on multi-year growth.[2] The switch emphasized sustainable operational cash generation over EBITDA, which included non-cash items, purportedly to better reflect dividend capacity and shareholder returns in a REIT structure.

63. The 2018 plan for 2019 compensation saw Equinix further massage the metric by replacing *absolute AFFO* with *AFFO/Share* in its incentive programs, including the AIP and performance-based restricted stock units ("**PRSUs**").

64. The AFFO/Share normalized for changes in share count (*e.g.*, from equity issuances or acquisitions), aiming to focus on per-share value creation and mitigate dilution effects, while

---

[2] *See* Equinix 2016 Proxy Statement, https://www.sec.gov/Archives/edgar/data/1101239/000117494716002516/def14a-19052_equinix.htm.

still weighting it at 50% alongside revenue in the AIP and applying it to 50% of executive RSU grants at target.[3]

65. The Company claimed that, unlike the 2015 *absolute AFFO* focus, the 2019 use of *AFFO/Share* introduced a denominator effect that would better align with stockholder interests in per-share growth, though both iterations maintained AFFO as a core REIT-aligned metric for short and long-term incentives.[4] Aligning with stockholder interests, however, was not the motivation for the shift – it was premised on compensation considerations.

66. The initial switch from *adjusted EBITDA* to *absolute AFFO* as a key performance metric in Equinix's 2015 executive incentive and long-term compensation plans enabled higher reported AFFO figures, which resulted in increased executive payouts through manipulated accounting practices. Specifically, following Equinix's REIT conversion in 2015, the Company reportedly misclassified Recurring capital expenditures as Non-Recurring CapEx, reducing reported maintenance costs by 47% that year and inflating AFFO by an estimated 19% in 2015 alone.[5]

67. The Compensation Committee formally adopted the 2019 AIP for FY19, which applied to Defendants Meyers and Taylor, in February 2019. In addition to receiving an annual salary, each would receive incentive compensation if Equinix met or exceeded certain AFFO per share and revenue targets during the FY19. As stated in the proxy statement filed by the Company on April 27, 2020 (the "**2020 Proxy**"):

---

[3] *See* Equinix, Inc., 2020 Proxy Statement, https://www.sec.gov/Archives/edgar/data/1101239/000104746920002602/a2241357zdef14a.htm.

[4] Equinix, Inc., Current Report (Form 8-K) (Feb. 22, 2019), retrieved from https://investor.equinix.com/sec-filings/all-sec-filings/content/0001101239-19-000002/a2019_8-kxfebx19xcompxdeci.htm.

[5] *See* Hindenburg Report at 9.

> For 2019… 100% of our short-term and 60% of our long-term incentives (assuming the target award amounts were earned) for our named executive officers were performance-based, dependent on annual revenue and [AFFO/Share] growth, along with relative total stockholder return ("**TSR**") achievement against the IWB Russell 1000 Index Fund[.].[6]

68. The FY19 AIP included an annual bonus, which was deemed "100% at risk" and paid only if revenue and AFFO/share targets were achieved. The targets were that the Company had to meet or exceed 95% of the target operating plan budget for revenue and AFFO/Share before an annual bonus was awarded. The 2020 Proxy further stated:

> Under the 2019 annual incentive plan, the Compensation Committee assigned each named executive officer an annual target bonus opportunity based on the achievement of specific goals related to ***revenue and AFFO/Share*** that tied to the 2019 annual operating plan approved by the Board. . . . The AFFO/Share goal set under the 2019 operating plan contemplated delivery of services to customers, asset maintenance, operating leverage, investments in the business, expansions in key markets, capital markets activity and distributions to our stockholders. Because there would be no incentive plan pool if revenue and AFFO/Share were 95% or less than the operating plan target, ***annual incentive compensation was 100% at risk***.

69. The targets for 2019 were $22.23 for AFFO/Share and $5.527 billion for revenue. If the targeted metrics were met in 2019, Meyers would be awarded a bonus of up to $1.3 million (or 130% of his base salary), and Taylor $748,000 (or 110% of his base salary). These annual bonus awards would be paid in stock. If the Company missed these targets by more than 5%, they would not receive these bonuses.

70. The AIP also contained long-term equity compensation for Meyers and Taylor that required that the Company meet certain AFFO/Share and revenue targets. The long-term incentive program contained three components: (i) an award based on AFFO/share and revenue (40%); (ii)

[6] Unless otherwise noted, emphasis in all quotations has been added.

an award based on three-year TSR (20%); and (iii) a time-based award (40%). For 2019, the long-term incentive compensation total for Meyers was 29,335 shares and for Taylor was 12,755 shares.

71. The Company's AIP remained materially similar throughout the Relevant Period; in particular, the Defendants could only receive annual bonuses and certain long-term compensation if the Company met certain revenue and AFFO/Share metrics. Defendants' misclassifying Recurring CapEx as Non-Recurring CapEx, as well as overselling power to boost revenue and AFFO, ensured that the bonus targets were met.

72. As a result, executives cashed out approximately $476 million in bonuses and incentives from 2015 to 2023, including $295.8 million in stock awards, incentivized by the metric's role in maximizing payouts.

***The Individual Defendants Knew that the Process Behind Classifying Recurring CapEx as Non-Recurring CapEx was Problematic***

73. [redacted]

74. [redacted]

75. [redacted]

76. [redacted]

77. [redacted]

78. [redacted]

79. [redacted]

[redacted]

80. [redacted]

***Defendants Caused Equinix to Report False and Misleading Quarterly and Annual FY19 Financial Results***

81. On May 1, 2019, July 31, 2019, October 30, 2019, and February 12, 2020, Equinix announced its quarterly and annual results for 1Q19, 2Q19, 3Q19 and 4Q19/FY19, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K (the "**FY19 Periodic Filings**") reflecting AFFO, AFFO/Share, and Recurring CapEx as follows:

| 2019 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|---|---|---|---|---|
| Q1 | $1,363 | $488 | $5.95 | $21 |
| Q2 | $1,385 | $498 | $5.87 | $37 |
| Q3 | $1,397 | $473 | $5.52 | $47 |
| Q4 | $1,417 | $473 | $5.47 | $81 |
| FY19 | $5,562 | $1,931 | $22.81 | $186 |

82. [redacted]

83. [redacted]

84. [redacted]

85. [redacted]

86. [redacted]

87. [redacted]

88. [redacted]

[redacted]

89. [redacted]

90. [redacted]

91. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

92. [redacted]

93. [redacted]

94. [redacted]

95. [redacted]

[redacted]

96. [redacted]

a. The Company's Annual Report on Form 10-K for FY 2019, filed with the SEC on February 21, 2020, indicated: "Our AFFO results have improved due to the improved operating results discussed earlier in 'Results of Operations,' as well as due to the nature of our business model which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in 'Overview.'"

b. A July 31, 2019, earnings call with analysts and investors where Defendant Taylor stated that the Company was "raising 2019 guidance across the board, including a substantial raise in our key AFFO and AFFO per share metrics due to better-than-expected revenue performance and improved operating leverage in the business."

c. An October 30, 2019, earnings call with analysts and investors where Defendant Taylor stated that the Company's "Q3 adjusted EBITDA was better than expected, primarily due to lower maintenance costs."

d. Defendant Meyers' January 7, 2020, presentation on behalf of the Company at the Citi Global TMT West Conference where he stated that he understood investors were focused on AFFO/share growth, specifically adding: "that's our kind of laser-focus in terms of a guiding light metric."

97. In a similar vein, during an earnings call held on February 12, 2020, Defendant Meyers falsely stated, in relevant part:

> We feel like it's our job to maximize long-term value creation . . . driving our own digital transformation are all things that are going to help us sustain AFFO per share growth. And frankly, that's our lighthouse metric, and we feel like it would be irresponsible not to invest behind the momentum that we have right now.

98. The foregoing statements, however, were false because the AFFO figures were inflated through systematic misclassification of approximately 5% of Recurring CapEx (such as costs for chillers and batteries) as Non-Recurring CapEx, in violation of the Company's own stated methodology and SEC Regulations G and S-K Item 10(e), which prohibit treating recurring expenses as non-recurring to mislead on non-GAAP metrics like AFFO. Without this misclassification, actual AFFO for 2019 would have been approximately $1.84 billion (or $21.72 per share), missing guidance and bonus thresholds.[7]

[7] *See* BARCLAYS RESEARCH, *Mounting Risks: Downgrading EQIX to Equal Weight,* (Sept. 23, 2022).

***The Individual Defendants Caused Equinix to Report False and Misleading Quarterly and Annual FY20 Financial Results***

99. On May 6, 2020, July 29, 2020, October 28, 2020, and February 10, 2021, Equinix announced its quarterly and annual results for 1Q20, 2Q20, 3Q20 and 4Q20/FY20, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K (the "**FY20 Periodic Filings**"). The FY20 Periodic Filings reflected AFFO, AFFO/Share, and recurring CapEx as follows:

| 2020 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|---|---|---|---|---|
| Q1 | $1,445 | $535 | $6.21 | $18 |
| Q2 | $1,470 | $558 | $6.35 | $30 |
| Q3 | $1,520 | $580 | $6.48 | $38 |
| Q4 | $1,564 | $516 | $5.76 | $74 |
| FY20 | $5,999 | $2,189 | $24.76 | $160 |

100. [redacted]

101. [redacted]

[redacted]

102. [redacted]

103. [redacted]

104. [redacted]

[redacted]

105. [redacted]

106. [redacted]

107. [redacted]

108. [redacted]

109. [redacted]

110. [redacted]

111. [redacted] each of the FY20 Periodic Filings falsely attributed the improvement in AFFO to "improved operating results," discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the improved operating results discussed earlier in "Results of Operations," as well as due to the nature of our business model which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

112. Moreover, on March 2, 2020, Defendant Taylor presented on behalf of the Company at the Morgan Stanley Technology, Media & Telecom Conference. Defendant Taylor falsely highlighted to investors Equinix's outlier status as it generated more AFFO/Share then the "next 6" public companies combined:

> Going back to my comment in AFFO, we threw up an AFFO per share, so it sort of levels the playing field with all the different capital structures. And we had – we deliver more AFFO per share than the next 6 combined, public companies combined.

113. On May 6, 2020, Equinix hosted an earnings conference call to discuss 1Q20 financial results. During the call, Defendant Taylor falsely stated that AFFO of $535 million was "above our expectations on a constant currency basis due to strong operating performance and lower-than-planned interest expense and income taxes." When asked specifically about the "variability in maintenance CapEx[,]" Defendant Taylor falsely responded:

> Sure. Yes. We did see slightly less this quarter than we anticipated, roughly 1.2%. If I go to the same quarter last year, it was 1.5% of revenues. I mean certainly, as we're all aware during the latter part of the quarter, things started to slow down a little bit. We also were putting our IBXs into a more restricted fashion. No surprise as things took root in different parts of the world. But all that said, when you look at our overall guidance, we're still looking at somewhere around $150 million to $160 million of capital that will go into recurring and only a portion of that, of course, is maintenance, roughly 2% of our recurring CapEx is maintenance. And so you'll see it go back to a more traditional level in Q2. That's reflected in the guidance. And then for the year, you'll see it. Roughly – a little bit lower than we saw last year, but roughly in line with what our expectations would be on a go-forward basis.

114. On February 10, 2021, the Company hosted an earnings call with analysts and investors to discuss 4Q20 financial results. During the call, Defendant Taylor falsely reported Q4 AFFO of $517 million, adding that the result was "meaningfully above our expectations on a

constant currency basis due to strong operating performance while absorbing seasonally higher recurring CapEx investments, a similar scenario to prior years."

115. The statements identified above in earnings conference calls and the FY20 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/Share) by improperly classifying Recurring CapEx as Non-Recurring CapEx in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. [redacted]

***The Individual Defendants Caused Equinix to Report False and Misleading Quarterly and Annual FY21 Financial Results***

116. On April 28, 2021, July 28, 2021, November 3, 2021, and February 16, 2022, Equinix announced its quarterly and annual results for 1Q21, 2Q21, 3Q21 and 4Q21/FY21, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K (the "**FY21 Periodic Filings**"). The FY21 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

| 2021 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|---|---|---|---|---|
| Q1 | $1,596 | $627 | $6.98 | $20 |
| Q2 | $1,658 | $632 | $7.01 | $45 |
| Q3 | $1,675 | $628 | $6.94 | $48 |
| Q4 | $1,706 | $564 | $6.22 | $86 |
| FY21 | $6,636 | $2,451 | $27.11 | $199 |

117. The results disclosed in the FY21 Periodic Filings, however, were false and misleading. The Individual Defendants knew or should have known that management misclassified CapEx. [redacted]

118. [redacted]

[redacted]

119. [redacted]

120. In light of the Hindenburg Allegations, which assert that Equinix intentionally inflated AFFO by ~$3 billion cumulatively since 2015 through misclassification of recurring maintenance CapEx as Non-recurring growth CapEx, violating company policy and SEC rules (Regulation G/S-K Item 10(e)) while enabling executive bonuses, [redacted]

[redacted]

121. [redacted]

122. [redacted]

123. [redacted]

124. [redacted]

125. [redacted]

126. Despite the foregoing, each of the FY21 Periodic Filings falsely attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the improved operating results discussed earlier in "Results of Operations," as well as due to the nature of our business model which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

127. On March 10, 2021, Equinix's Chief Customer & Revenue Officer, Karl Strohmeyer, presented on behalf of the Company at the Deutsche Bank Virtual Media Internet and Telecom Conference. During the conference, he described revenue and AFFO per share growth as the "things that obviously investors really care about[.]"

128. On April 28, 2021, the Company hosted an earnings conference call to discuss 1Q21 financial results. During the call, Defendant Taylor reported Q1 AFFO as $627 million, adding that it was "meaningfully above our expectations due to strong operating performance and lower seasonal recurring capital expenditures."

129. On July 28, 2021, Equinix hosted an earning conference call to discuss 2Q21 financial results. During the call, Defendant Taylor reported that Q2 AFFO was "$632 million, including a $25 million recurring CapEx increase compared to the prior quarter, above our expectations due to strong operating performance and lower integration costs."

130. On January 5, 2022, Defendant Meyers presented at the Citi Apps Economy Conference on behalf of the Company. During the conference, Defendant Meyers discussed AFFO per share growth, stating in relevant part:

> Well, I mean, to some degree, that's clearly the way we think about it, right, which is, hey, what do we need to do in terms of delivering margin expansion because in the end, we have to deliver the AFFO per share growth, right? And so – and because we serve – aren't going to get that below the line, then what we have to do is get good solid growth, and then we have to flow that through. And if we want to perform on the AFFO per share line, we have to continue to drive some level of operating leverage in the business.

131. During a Company earnings call held February 16, 2022, to discuss 4Q21 and FY21 financial results, Defendant Taylor was asked what was driving years of the Company's CapEx being at the low end of its forecasted range. In response, Defendant Taylor stated:

> And so just the recurring CapEx, we are at . . . sort of the lower end of the range for fiscal year '22[.] And so you saw an elevated Q4 number at roughly 5% recurring CapEx relative to revenue. It steps down, of course, in Q1. And then as we look through the year, it is roughly somewhere between 2% and 3%. But I think the biggest thing is really about timing and a number of new assets that we're bringing into the portfolio. And as a result, when you think about the level of recurring CapEx that has to be made, the newer the portfolio, the better the position you have on recurring CapEx.

132. The statements identified above during earnings conference calls, public presentations, and in the FY21 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (i) the Company overstated AFFO

(and AFFO/Share) by improperly classifying Recurring CapEx as Non-Recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; and (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance.

***The Individual Defendants Caused Equinix to Report False and Misleading Quarterly and Annual FY22 Financial Results***

133. On April 27, 2022, July 27, 2022, November 2, 2022, and February 15, 2023, Equinix announced its quarterly and annual results for 1Q22, 2Q22, 3Q22 and 4Q22/FY22, respectively, accompanied by the filing of its quarterly Form 10-Qs and annual Form 10-K (the "**FY22 Periodic Filings**"). The FY22 Periodic Filings reflected AFFO, AFFO/Share, and recurring CapEx as follows:

| 2022 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|---|---|---|---|---|
| Q1 | $1,734 | $653 | $7.16 | $24 |
| Q2 | $1,817 | $691 | $7.58 | $35 |
| Q3 | $1,841 | $712 | $7.73 | $50 |
| Q4 | $1,871 | $658 | $7.09 | $80 |
| FY22 | $7,263 | $2,714 | $29.55 | $189 |

134. [redacted]

[redacted]

135. [redacted]

136. As the Hindenburg Report noted, 80% of AFFO boosts came from understating Recurring CapEx (*e.g.*, reclassifying routine maintenance as "upgrades" via tricks like new serial numbers on rebuilt chillers). For 2022, reported recurring CapEx was ~$189 million (2.6% of ~$7.26 billion revenue), but at the 2014 pre-REIT ~5% benchmark, it should have been ~$363

million, inflating AFFO by ~$174 million. This contrast, amid aging infrastructure (260+ data centers), mirrors patterns where AFFO was propped up to meet bonus targets (*e.g.*, 2022 threshold ~$29.44/share; actual without inflation $27.66, a miss), as ex-employees described management-directed incentives to misclassify CapEx to maximize executive compensation.

137. Nevertheless, each of the FY22 Periodic Filings falsely attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the improved operating results discussed earlier in "Results of Operations," as well as due to the nature of our business model which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

138. For example, on April 27, 2022, the Company hosted an earnings call with analysts and investors to discuss 1Q22 financial results. During the call, Defendant Meyers assured investors that Equinix would meet its AFFO guidance through top line growth and operating leverage, stating, in part: "[A]t the end of the day, that's really our lighthouse metric is driving that AFFO per share growth."

139. On May 23, 2022, Defendant Meyers appeared on behalf of the Company at the JPMorgan Global Technology, Media & Communications Conference. During the conference, Defendant Meyers falsely stated that the Company's focus "is on long-term value creation, and that primarily is in the form of AFFO per share growth. And so that's really our lighthouse metric."

***Barclays Report Raises Issues That the Company Ignores***

140. On September 23, 2022, Barclays issued a report titled *Mounting Risks: Downgrading EQIX to Equal Weight* (the "**Barclays Report**"). The Barclays Report reasoned that Equinix was likely overstating AFFO, noting that the Company's recurring CapEx averaged 8.7%

of revenue before the transition to a REIT, but dropped to just 3.6% of revenue afterward. Specifically, the Barclays Report stated, in relevant part:

> Investor attention has recently focused on earnings quality, and specifically how maintenance and and [sic] growth capex are allocated. As AFFO is a non-GAAP number, our sense is management teams have a fair amount of discretion in how the spending is characterized. This is particularly relevant because REITs deduct maintenance capex from FFO when calculating AFFO, but not growth capex. (EQIX specifically uses the labels "recurring vs. non-recurring" capex, instead of "maintenance vs. growth" but we see no material difference in the definitions). In the three years prior to becoming a REIT (2012-2014), EQIX's recurring capex averaged 8.7% of revenue (during this period EQIX used the term "ongoing" capex, but again no material difference in definition). Since 2015 when the company filed as a REIT, recurring capex as averaged 3.6%.

FIGURE 3. **Recurring capex as % of total revenue**




Note: From 2012-2014 EQIX reported "ongoing" capex, and switched to "recurring" capex in 2015. Based on 10K filings, we do not see a functional difference in the definitions.
Source: Company documents, Barclays Research

FIGURE 4. **Recurring capex as % of depreciation**




Note: From 2012-2014 EQIX reported "ongoing" capex, and switched to "recurring" capex in 2015. Based on 10K filings, we do not see a functional difference in the definitions.
Source: Company documents, Barclays Research

141. The Barclays Report also reasoned that there was no "plausible reason" for Equinix's change in the methodology for classifying CapEx after 2014, other than to inflate AFFO, stating in relevant part:

> We acknowledge the capex growth and CabE CAGR comparison is complicated by the net purchase of assets since 2014, but that would also increase the cabinet total, all else equal. Management suggests it is expensing ~3% of revenue on maintenance, in addition to the ~3% of revenue accounted for as maintenance capex in AFFO. Still, we do not see a plausible reason why capex accounting changed after 2014, other than to reflect higher AFFO.

> Normalizing recurring capex as a percentage of revenue based on the preREIT 2013-2015 average of 8.7%, reduces AFFO/ps by an average of 15% in each year. EQIX forward multiple of AFFO has contracted from a high of ~30x to ~20x now. Absent clarity on the evolution of this accounting metric, we struggle to see how the stock can recapture its previous trading multiple.

FIGURE 5. **Cabinet growth trails non-reccurring capex, suggesting some capital spending is recurring**




Source: Company documents, Barclays Research

FIGURE 6. **Reported AFFO vs. AFFO normalized with recurring capex reflecting 8.7% of revenue**




Note: Normalized recurring capex reflects 8.7% of total revenue, the average from 2013-2015 prior to REIT conversion
Source: Company documents, Barclays Research

142. On this news, Equinix's stock price declined by approximately 2.6%, from $609.26 per share on September 22, 2022, to $593.13 per share on September 23, 2022.

143. On November 2, 2022, Equinix hosted an earnings conference call to discuss 3Q22 financial results. During the call, Defendant Meyers reported that adjusted EBITDA was up 11% year-over-year, with "AFFO meaningfully ahead of our expectations due to strong operating performance." Neither Meyers nor anyone else from the Company addressed Barclay's assertion that there was no "plausible reason why capex accounting changed after 2014, other than to reflect higher AFFO."

144. On January 4, 2023, Defendant Meyers appeared at the Citi Communications, Media & Entertainment Conference on behalf of the Company. During the conference, Defendant Meyers stated, in relevant part:

> I will say this in terms of giving you a little more concrete answer on that, we clearly see operating leverage as one fundamental element of driving AFFO per share growth, which we view as the lighthouse metric for our business. Because at the end, I think

> investors see it and say, "Look, what do I get in terms of dividend yield and what are you going to give me on AFFO per share," right? And so that's fundamentally our people. And we very – we have that very deeply ingrained into our thinking about how we run the business.

145. The statements identified above during earnings conference calls, public presentations, and in the FY22 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (i) the Company overstated AFFO (and AFFO/Share) by improperly classifying Recurring CapEx as Non-Recurring CapEx in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***The Individual Defendants Caused Equinix to Report False and Misleading Quarterly and Annual FY23 Financial Results***

146. On May 3, 2023, August 2, 2023, October 25, 2023, and February 14, 2024, Equinix announced its quarterly and annual results for 1Q23, 2Q23, 3Q23 and 4Q23/FY23, respectively, accompanied by the filing of its quarterly Form 10-Qs and annual Form 10-K (the "**FY23 Periodic Filings**"). The FY23 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

| 2023 | Revenue (millions) | AFFO (millions) | AFFO/share | Recurring CapEx (millions) |
|---|---|---|---|---|
| Q1 | $1,998 | $802 | $8.59 | $22 |
| Q2 | $2,018 | $754 | $8.04 | $40 |
| Q3 | $2,061 | $772 | $8.19 | $52 |
| Q4 | $2,110 | $691 | $7.30 | $105 |
| FY23 | $8,188 | $3,019 | $32.11 | $219 |

147. [redacted]

148. [redacted]

149. [redacted]

150. In light of the allegations in the Hindenburg Report, which assert that Equinix intentionally inflated AFFO by ~$3 billion cumulatively since 2015 through misclassification of recurring maintenance CapEx as non-recurring growth CapEx, violating Company policy and SEC rules (Regulation G/S-K Item 10(e)) while enabling executive bonuses, the following information from the FY23 Periodic Filings and [redacted] should have served as red flags to the Board, indicating potential accounting malfeasance and prompting an immediate investigation.

151. [redacted]

[redacted]

152. [redacted]

153. Nevertheless, each of the FY23 Periodic Filings falsely attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the improved operating results discussed earlier in "Results of Operations," as well as due to the nature of our business model which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

154. Accordingly, the statements identified above during earnings conference calls, public presentations, and in the FY23 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

155. For each fiscal year from 2019 to 2023, the Company reported meeting or beating annual AFFO guidance provided to investors at the outset of each fiscal year (typically during February, and at times during the course of the year). But for the Individual Defendants' deliberate scheme to mischaracterize Recurring CapEx as Non-Recurring CapEx, Equinix would not have achieved its AFFO guidance in each year from 2019 to 2023:

| Adjusted AFFO Results | | | | | |
|---|---|---|---|---|---|
| (amounts in millions) | 2019 | 2020 | 2021 | 2022 | 2023 |
| Reported AFFO | $1,931.1 | $2,189.1 | $2,451.2 | $2,713.8 | $3,018.5 |
| Actual AFFO without Inflated CapEx | $1,839.0 | $2,049.9 | $2,318.5 | $2,539.6 | $2,827.4 |
| AFFO $ Overstatement | $92.1 | $139.2 | $132.7 | $174.2 | $191.1 |
| AFFO Guidance | $1,913.0 | $2,157.0 | $2,444.0 | $2,676.0 | $2,996.0 |
| AFFO Guidance without Inflated Capex | $1,820.9 | $2,017.7 | $2,311.3 | $2,501.7 | $2,804.8 |
| Guidance Miss | 4.8% | 6.5% | 5.4% | 6.5% | 6.4% |
| **Meet or Beat?** | **No** | **No** | **No** | **No** | **No** |

***Meyers Abruptly Announces Resignation of His CEO Position; Chairman of the Board Also Announces Departure***

156. On March 12, 2024, just one week after Equinix's stock hit a Relevant Period high closing price of $913.66 per share, and just eight days before Hindenburg Research issued its negative report based on interviews with multiple former Equinix executives, the Company made the unanticipated announcement that Defendant Meyers would be stepping down as CEO. In the same release, Equinix announced that Defendant Van Camp would be leaving his position as Chairman of the Board:

> On March 7, 2024, as part of a planned succession process, the Board of Directors ("the Board") of Equinix, Inc. (the "Company") approved the appointment of Adaire Fox Martin, a current member of the Board, as its new President and Chief Executive Officer. The appointment will be effective on a mutually agreed date that is expected to be later in our second fiscal quarter, but no later than June 17, 2024 (the applicable start date, the "Transition Date").
>
> * * *
>
> As part of this succession process, effective on the Transition Date, Peter Van Camp, the Company's current Executive Chairman, will resign from that position and from his service as a Board member.

157. On March 12, 2024, BMO Capital Markets issued an analyst report titled *Surprise CEO Change; Expecting Smooth Transition* which noted that Meyers' announcement was unanticipated:

> We are somewhat surprised by the announcement, but given Ms. Fox-Martin's industry background and familiarity with EQIX, we expect a smooth transition. We do not expect any near-term strategic changes and continue to expect EQIX to deliver HSD LT AFFO/share growth.

158. On March 13, 2024, Wells Fargo issued an analyst report titled *EQIX: A Surprising Change to the EQIX C-Suite* which confirmed the unexpected nature of the announcement:

> While we were surprised to see EQIX CEO Charles Meyers stepping away after 5+ years at the helm, it doesn't appear to signal any shift in corporate strategy or focus given incoming CEO Adaire Fox-Martin's familiarity with the company.

159. On this news, Equinix's stock price declined from $892.81 on March 12, 2024, to $867.23 on March 13, 2024, a drop of $25.58 or 2.87% on increased volume.

***The Hindenburg Report***

160. On March 20, 2024, the Hindenburg Report was published disclosing the accounting machinations, which included the Hindenburg Allegations previously set forth above, as well as the following:

> Our research, however, found that this sustained rise in reported AFFO, driven by shrinking reported maintenance CapEx, is more financial engineering than *actual* engineering.
>
> Our investigation involved interviewing 37 former Equinix employees, industry experts and competitors, along with reviewing financial statements and litigation records.
>
> Our investigation found that Equinix (i) bases its executive bonus compensation on the company's AFFO metric (ii) then manipulates its accounting for maintenance CapEx to overstate this AFFO figure, resulting in the illusion of vastly higher AFFO, higher executive bonus compensation and an inflated stock price.

161. The Hindenburg Report also analyzed the Company's operating margins compared to its peers:

> In 2023, Equinix reported… a 17.6% operating margin, almost double the 9.5% margin reported… by its closest peer, Digital Realty. The margins imply that Equinix is vastly more profitable…, therefore justifying a higher stock multiple.
>
> Former employees told us that those abnormally high operating margins were engineered with more accounting trickery. In addition to misclassifying CapEx between maintenance and growth, management pressured employees to push operating expenses ("OpEx") into CapEx, sometimes regardless of the nature of the spend.

162. The Hindenburg Report further noted that "[r]eclassifying operating expenses as CapEx to boost profitability metrics ***is a notorious accounting trick and was at the center of the WorldCom scandal***... in the early 2000s, in perhaps the best-known example."

163. The Hindenburg Report related how Equinix's accounting department would pressure employees from other parts of the Company to reclassify operating expenses as CapEx. The Hindenburg Report quoted a former data center manager as saying that the accounting department viewed operational expenses as "dirty spend" and would pressure teams to book expenses as CapEx.

164. The Hindenburg Report also explained that accounting manipulations used to boost AFFO "result in reported metrics that defy logic." It specifically referred to recurring capital expenditures of $14.5 million in 1Q20 and projected recurring CapEx of $14-34 million for the first quarter of 2024, despite the fact that Equinix now operates 260 data centers and only operated 51 data centers in 1Q10.

165. The Hindenburg Report questioned Equinix's reported growth CapEx, given that its billed cabinet growth slowed in 2023. The Hindenburg Report stated the following:

> Another widely-watched metric that *should* have some relation to growth CapEx ***is the growth of cabinets***, the [physical enclosed areas] that data centers offer to clients. In its Q3 2023 investor call, the CEO mentioned [. . .] ***the importance of the metric, saying it***

> ***would "have to be a part of the growth story over time"*. *Given this, one might expect that with Equinix's massive claimed growth CapEx, billed physical cabinet metrics would be growing quickly along with it*.
>
> However, while reported growth CapEx stood at all-time highs in 2023, ***year-on-year billed cabinet growth fell from 14.8% in 2018 to 1.7% in 2023***.

166. The Hindenburg Report discussed how "Equinix's questionable AFFO accounting has substantially contributed to $295.8 million in stock award grants to top executives." The Hindenburg Report quoted a "former executive" as stating that "[t]here's every incentive to categorize as much as you can as expansion [growth] CapEx."

167. The Hindenburg Report then stated that "[a]s noted earlier, in 2015, Equinix changed... its executive compensation plan to specifically reward AFFO growth, ***with 50% of annual incentive pay weighted toward AFFO*** and 50% to revenue[.]" Further, the Hindenburg Report stated that "AFFO has been a key metric in executive performance awards in every year since then." The Hindenburg Report stated that in 2022, "AFFO per share still remained ***one of the key metrics considered in Annual Incentive and Long Term Performance Incentives***."

168. The Hindenburg Report stated that "[a]s a result, since 2015, senior executives have been awarded ~ $295.8 million in cumulative stock awards, with stock awards rising almost every year."

169. The Hindenburg Report stated that "[a] former executive told us this compensation policy incentivized executives to push the boundaries on CapEx classification," and quoted that former executive as saying "[y]ou're being valued off and you know your executive comp[ensation] is tied to AFFO per share. ***There's every incentive to categorize as much as you can as expansion [growth] CapEx…they're making that case for every questionable piece of CapEx.***"

170. In summary, the Report stated, "by ***reducing reported maintenance CapEx and inflating accounting metrics like AFFO***, Equinix executives ***have ensured they personally benefit*** from their accounting manipulations."

171. Then, on March 25, 2020, before the market opened, the Company filed with the SEC a current report on Form 8-K, attached to which was a press release that stated the following, in pertinent part:

> [T]he Audit Committee of the company's Board of Directors ***has commenced an independent investigation to review the matters referenced in a recent short seller report***. Shortly after the release of the report, ***the company received a subpoena from the U.S. Attorney's Office for the Northern District of California***. Receipt of these types of inquiries is not unusual in these circumstances, and Equinix intends to fully cooperate in this matter. The company does not expect to comment further on such matters until appropriate to do so.

172. On this news, the price of Equinix stock fell by $8.45 per share, or 1.05%, to close at $792.52 on March 25, 2024.

## THE 2023 PROXY WAS FALSE AND MISLEADING

173. On April 12, 2023, Equinix filed a definitive proxy statement with the SEC (the "**2023 Proxy**") that violated Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 because it included materially false and misleading statements and omissions. These misstatements and omissions misled shareholders in voting on key proposals, particularly the election of directors (including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Olinger, Paisley, Patel, Rivera, Russo, and Van Camp).

174. The 2023 Proxy stated that Equinix adopted a Code of Business Conduct applicable to all officers, directors, and employees. It described the Code as promoting "honest and ethical conduct," including handling conflicts of interest, accurate financial reporting, and compliance

with laws. It noted that violations are subject to discipline (up to termination), and any waivers for executives/directors must be approved by the Board and disclosed. The proxy claimed that the Code ensures "transparency" and "adherence to the highest ethical standards," with an opening letter from the CEO emphasizing integrity in financial reporting.

175. This statement was false and misleading because it omitted that the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed. As alleged herein, the Individual Defendants violated the Code by misclassifying CapEx (e.g., routine maintenance like chillers/batteries as "upgrades"), inflating AFFO by ~$729 million (2019-2023), and failing honest record-keeping. This breached the "Conflicts of Interest" (prioritizing bonuses over accuracy) and "Our Commitment to the Law" (SEC compliance) provisions of the Code of Conduct. By implying full compliance (for example, stating that Equinix "reflects the ethical values... of our people"), the Proxy omitted that the Board permitted or ignored these violations, despite red flags in Board minutes indicating low recurring CapEx amid growth.

176. The 2023 Proxy described the Board's "oversight of risk management" as supporting "organizational objectives" and "enhanc[ing] stockholder value." It detailed annual enterprise risk briefings (September 2022 on cybersecurity and other risks), global risk assessments for "strategic, operational, financial and regulatory compliance risks," and committee roles (Audit Committee oversees "financial reporting processes and disclosure controls"). It stated that the full Board receives quarterly updates, with access to management, and held a September 2022 strategy meeting on risks. It claimed this ensures "steps management has taken to monitor and control such exposures."

177. This statement was false and misleading because it omitted that the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements. Despite claims of robust monitoring, the Complaint alleges the Board ignored red flags in management reports (e.g., recurring CapEx at 2.7% of revenue vs. expected 5%, inflating 2023 AFFO by ~$191 million. This violated the Audit Charter's mandate to review "financial reporting processes" and "internal control policies." The scheme (misclassifying CapEx to hit AFFO targets) exposed the Company to government probes (ongoing as of July 2025) and a $41.5 million Securities Class Action settlement.

178. The 2023 Proxy's portrayal of "adequate and functioning system of internal... controls" was false, given the want of a "system to oversee mission-critical compliance risks" (for example, AFFO manipulation for bonuses, breaching fiduciary duties). Moreover, [redacted]

179. The 2023 Proxy stated that AFFO is defined as a "non-GAAP" metric excluding Recurring CapEx ("expenditures to extend the useful life of... data centers... required to support current revenues"). It is then weighted 50% in incentives (with revenue), as the "lighthouse metric" for bonuses and RSUs, tied to "asset maintenance" and growth. The 2023 Proxy claims that 2019-2022 AFFO goals were met (2022: $29.55/share vs. $29.44 target), justifying payouts to Meyers of $23.9 million in 2023 compensation. It also asserts accurate SOX certifications and internal controls.

180. This statement was false and misleading because it omitted that the Company overstated AFFO (and AFFO/Share) by improperly classifying Recurring CapEx as Non-

Recurring CapEx in violation of its own stated guidelines and SEC rules and regulations. The definition omits that Recurring CapEx was misclassified (batteries as "system upgrades"), violating the 2014 policy (end-of-life items as recurring) and SEC rules (prohibiting misleading non-GAAP by excluding "normal, recurring" costs). This inflated 2023 AFFO by ~6% (a $191 million overstatement), ensuring bonus thresholds (e.g., 2023: $32.25 per share reported vs. $30.08 actual, missing the $30.38 target without it).

181. The statements in the 2023 Proxy were further false and misleading because they omitted the improper classification of CapEx and thus materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance. Claims of "strong operating performance" hid that AFFO beats (*e.g.*, 9-11% YoY growth) relied on fraud, not business acumen. The 2023 Proxy tied executive compensation to AFFO (50% weighting) but omitted disclosing that the scheme enabled ~$476 million in payouts (2015-2023), breaching the Code's requirement for maintaining "honest [and] accurate" records.

182. The foregoing statements were further false and misleading because they omitted that Equinix lacked adequate internal controls. The Company was beset with compliance problems that posed significant risks of harm, and the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

183. The 2023 Proxy failed to disclose that: (i) the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed; and (ii) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

184. The 2023 Proxy further failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

185. The false and misleading elements of the 2023 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the election and reelection of certain directors, and caused economic harm to the Company, including inflated metrics that enabled ~$476 million in payouts (2015-2023), wasting assets. Moreover, Equinix is exposed to lawsuits/probes (namely a $41.5 million settlement related to 2019-2024 misstatements), legal fees, and reputational damage stemming from the Hindenburg Report.

**UNWARRANTED INCENTIVE COMPENSATION**

186. During the Relevant Period, the Compensation Committee established executive compensation plans that required the Company to achieve specific revenue and AFFO/share targets for Meyers and Taylor to earn their bonuses.

187. If Equinix fell short of these targets by more than 5%, Meyers and Taylor risked forfeiting their entire potential bonus. These bonuses substantially exceeded the Individual Defendants' annual salaries.

188. Over the course of the Relevant Period, Meyers received more than $106 million in bonuses, amounting to twenty times his salary, while Taylor received more than $42 million in bonuses, equivalent to twelve times his salary.

189. The Individual Defendants received various forms of bonuses annually: Annual incentive compensation, based 50% on achieving an AFFO/share target and 50% on a revenue target. They also received long-term compensation with three components: (i) an award tied to AFFO/Share and revenue (40%); (ii) an award based on three-year TSR (20%); and (iii) a time-

based award (40%). Consequently, half of the annual bonus and 20% of the long-term compensation were directly contingent on meeting the AFFO/share target.

190. For each completed year during the Relevant Period (FY19-FY23), the Company's DEF 14A Proxy reported that the Company had met or exceeded the AFFO/Share target necessary for the Individual Defendants to receive 100% or more of their various bonuses. In four out of the five years, absent the Individual Defendants' fraudulent scheme, the Company would not have attained the required AFFO/Share levels to justify their bonus payments:

191. For FY23, the Individual Defendants were awarded more than 100% of their annual incentive compensation but less than 100% of their long-term incentive compensation because, despite meeting the AFFO/Share target, they missed on other targets. They still received more than 84% of total potential long-term compensation and more compensation than the prior year:

| Adjusted AFFO/Share Results | | | | | |
|---|---|---|---|---|---|
| (shown AFFO/share) | Target | Reported Results | Adjusted Results | Actual Results | Meet or Beat Target |
| 2019 | $22.23 | $22.81 | $22.69 | $21.72 | No |
| 2020 | $24.60 | $24.76 | $24.93 | $23.19 | No |
| 2021 | $25.56 | $27.11 | $26.97 | $25.65 | Yes |
| 2022 | $29.44 | $29.55 | $30.65 | $27.66 | No |
| 2023 | $30.38 | $32.25 | $30.97 | $30.08 | No |

192. As a result of meeting the AFFO/Share and revenue targets, the Individual Defendants received bonus compensation far exceeding their salaries. For example, Meyers' total compensation awarded during the was as follows:

| Meyer's Class Period Compensation | | | | | |
|---|---|---|---|---|---|
| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| 2019 | $1,000,000 | $15,477,843 | $59 | $97,694 | $16,575,596 |
| 2020 | $1,048,654 | $24,748,074 | $605 | $38,935 | $25,836,268 |
| 2021 | $1,050,000 | $22,150,441 | $256 | $47,496 | $23,248,193 |
| 2022 | $1,050,000 | $21,145,956 | $297 | $86,675 | $22,282,928 |
| 2023 | $1,050,000 | $22,821,961 | $503 | $54,988 | $23,927,452 |
| **TOTAL** | **$5,198,654** | **$106,344,275** | **$1,720** | **$325,788** | **$111,870,437** |

193. Taylor's total compensation awarded during the Class Period was as follows:

| Taylor's Class Period Compensation | | | | | |
|---|---|---|---|---|---|
| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| 2019 | $680,000 | $6,912,204 | $208 | $8,250 | $7,600,662 |
| 2020 | $680,000 | $8,524,885 | $82 | $12,045 | $9,217,012 |
| 2021 | $680,000 | $8,023,062 | $544 | $8,550 | $8,712,156 |
| 2022 | $680,000 | $8,607,310 | $1 | $34,517 | $9,321,828 |
| 2023 | $680,000 | $10,916,747 | $249 | $45,808 | $11,642,804 |
| **TOTAL** | **$3,400,000** | **$42,984,208** | **$1,084** | **$109,170** | **$46,494,462** |

## INSIDER TRADING ALLEGATIONS

194. Defendants Meyers, Taylor, Van Camp, Paisley, and Hromadko conducted substantial insider selling during the Relevant Period.[8]

195. Defendant Meyers' sales during the Relevant Period were as follows:

| Date of Sale | Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 9/4/2019 | 1,928 | $565.91 | $1,091,074 |
| 1/16/2020 | 5,562 | $586.24 | $3,260,666 |
| 2/19/2020 | 3,504 | $644.63 | $1,043,251 |
| 2/26/2020 | 1,705 | $631.98 | $1,077,525 |
| 2/28/2020 | 3,376 | $597.49 | $2,017,126 |
| 3/2/2020 | 975 | $572.80 | $558,480 |
| 3/3/2020 | 933 | $618.88 | $577,415 |
| 3/16/2020 | 2,093 | $621.09 | $1,299,941 |
| 9/2/2020 | 2,590 | $787.31 | $2,039,133 |
| 1/15/2021 | 4,791 | $689.67 | $3,304,208 |

[8] Sales proceeds are based on the average price per share on the day of each sale.

| | | | |
|---|---|---|---|
| 1/19/2021 | 4,947 | $707.76 | $3,501,288 |
| 1/20/2021 | 1,329 | $716.32 | $951,989 |
| 2/16/2021 | 59 | $709.80 | $41,878 |
| 2/17/2021 | 2,192 | $693.71 | $1,520,614 |
| 2/18/2021 | 1,778 | $687.38 | $1,222,158 |
| 2/22/2021 | 2,602 | $680.22 | $1,769,932 |
| 3/1/2021 | 4,307 | $648.34 | $2,792,400 |
| 3/2/2021 | 1,135 | $648.26 | $735,775 |
| 3/11/2021 | 2,465 | $638.70 | $1,574,395 |
| 6/7/2021 | 5,051 | $785.39 | $3,967,004 |
| 9/2/2021 | 2,589 | $868.84 | $2,249,426 |
| 1/19/2022 | 9,579 | $742.94 | $7,116,622 |
| 2/14/2022 | 60 | $671.52 | $40,291 |
| 2/16/2022 | 2,717 | $673.38 | $1,829,573 |
| 2/17/2022 | 5,996 | $673.58 | $4,038,785 |
| 2/25/2022 | 2,879 | $705.49 | $2,031,105 |
| 3/2/2022 | 1,744 | $710.80 | $1,239,635 |
| 3/11/2022 | 2,229 | $706.48 | $1,574,743 |
| 5/5/2022 | 12,244 | $711.91 | $8,716,617 |
| 9/2/2022 | 284 | $653.30 | $185,537 |
| 9/8/2022 | 377 | $647.20 | $243,994 |
| 1/18/2023 | 7,378 | $718.00 | $5,297,404 |
| 1/19/2023 | 9,160 | $702.68 | $6,436,548 |
| 2/16/2023 | 6,014 | $727.25 | $4,373,681 |
| 3/2/2023 | 289 | $675.98 | $195,358 |
| 3/9/2023 | 2,859 | $694.02 | $1,984,203 |
| 8/11/2023 | 7,439 | $774.09 | $5,758,456 |
| 1/17/2024 | 7,174 | $819.12 | $5,876,367 |
| 1/18/2024 | 8,718 | $798.86 | $6,964,461 |
| 2/13/2024 | 2,110 | $849.98 | $1,793,458 |
| 2/16/2024 | 3,018 | $874.97 | $2,640,659 |
| 3/7/2024 | 1,754 | $906.64 | $1,590,247 |
| **Total:** | **149,933** | | **$107,738,947** |

196. Defendant Taylor's sales during the Relevant Period were as follows:

| Date of Sale | Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2020 | 3383 | $592.28 | $2,003,683.24 |
| 2/19/2020 | 1693 | $646.35 | $1,094,270.55 |
| 2/28/2020 | 1532 | $574.54 | $880,195.28 |
| 3/16/2020 | 1204 | $566.91 | $682,559.64 |
| 8/14/2020 | 1000 | $767.45 | $767,450.00 |
| 9/2/2020 | 82 | $786.44 | $64,488.08 |
| 11/16/2020 | 1000 | $749.67 | $749,670.00 |
| 1/19/2021 | 3291 | $716.85 | $2,359,153.35 |

| | | | |
|---|---|---|---|
| 2/17/2021 | 1551 | $693.29 | $1,075,292.79 |
| 2/22/2021 | 1041 | $667.01 | $694,357.41 |
| 3/2/2021 | 81 | $648.26 | $52,509.06 |
| 3/11/2021 | 1171 | $638.7 | $747,917.70 |
| 5/13/2021 | 1000 | $711.35 | $711,350.00 |
| 8/19/2021 | 1000 | $827.85 | $827,850.00 |
| 9/2/2021 | 4000 | $869.08 | $3,476,320 |
| 9/2/2021 | 81 | $868.84 | $70,376.04 |
| 11/18/2021 | 1000 | $799.99 | $799,990.00 |
| 1/19/2022 | 4439 | $740.21 | $3,285,792.19 |
| 2/16/2022 | 1228 | $668.82 | $821,310.96 |
| 2/25/2022 | 1158 | $701.42 | $812,244.36 |
| 3/2/2022 | 81 | $710.79 | $57,525.39 |
| 3/11/2022 | 1058 | $701.78 | $742,483.24 |
| 5/23/2022 | 1000 | $658.39 | $658,390.00 |
| 9/2/2022 | 79 | $653.29 | $51,609.91 |
| 12/1/2022 | 2500 | $699.90 | $1,749,750.00 |
| 1/18/2023 | 3032 | $706.72 | $2,142,775.04 |
| 2/16/2023 | 2566 | $727.25 | $1,866,123.50 |
| 3/2/2023 | 79 | $665.87 | $52,603.73 |
| 3/9/2023 | 1358 | $688.48 | $934,955.84 |
| 6/9/2023 | 1000 | $753.44 | $753,440.00 |
| 8/4/2023 | 1000 | $758.00 | $758,000.00 |
| 8/30/2023 | 2000 | $790.41 | $1,580,820.00 |
| 11/3/2023 | 1000 | $776.26 | $776,260.00 |
| 1/17/2024 | 3280 | $800.66 | $2,626,164.80 |
| 2/13/2024 | 1164 | $832.98 | $969,588.72 |
| 2/16/2024 | 1322 | $874.97 | $1,156,710.34 |
| 3/7/2024 | 833 | $906.64 | $755,231.12 |
| **Total:** | **54,287** | | **$39,609,212.28** |

197. Defendant Van Camp's sales during the Relevant Period were as follows:

| Date of Sale | Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 8/9/2019 | 3,191 | $542.37 | $1,730,702 |
| 1/18/2020 | 1,459 | $586.24 | $855,324 |
| 2/19/2020 | 986 | $643.58 | $634,574 |
| 2/28/2020 | 534 | $597.49 | $319,059 |
| 3/16/2020 | 289 | $621.09 | $179,495 |
| 1/19/2021 | 1,892 | $707.76 | $1,339,081 |
| 2/17/2021 | 943 | $688.09 | $648,868 |
| 2/22/2021 | 170 | $680.22 | $115,637 |
| 3/11/2021 | 469 | $638.70 | $299,550 |
| 8/5/2021 | 1,456 | $828.52 | $1,206,329 |
| 1/19/2022 | 1,297 | $742.94 | $963,593 |

| | | | |
|---|---|---|---|
| 2/16/2022 | 335 | $673.38 | $225,582 |
| 2/25/2022 | 165 | $705.48 | $116,405 |
| 3/8/2022 | 1,000 | $688.05 | $688,050 |
| 3/11/2022 | 424 | $706.48 | $299,547 |
| 1/18/2023 | 462 | $718.00 | $331,716 |
| 2/16/2023 | 350 | $727.25 | $254,537 |
| 3/9/2023 | 544 | $694.02 | $377,547 |
| 1/17/2024 | 420 | $819.12 | $344,030 |
| 2/13/2024 | 122 | $849.98 | $103,698 |
| 2/16/2024 | 175 | $874.97 | $153,120 |
| 3/7/2024 | 334 | $906.64 | $302,818 |
| **Total:** | **17,017** | | **$11,489,263** |

198. Defendant Paisley's sales during the Relevant Period were as follows:[9]

| Date of Sale | Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 5/20/2019 | 200 | $487.88 | $97,576 |
| 8/20/2019 | 200 | $551.24 | $110,248 |
| 11/19/2019 | 200 | $557.29 | $111,458 |
| 2/18/2020 | 200 | $644.17 | $128,834 |
| 5/19/2020 | 200 | $633.00 | $126,600 |
| 8/21/2020 | 200 | $787.71 | $157,542 |
| 11/16/2020 | 200 | $762.57 | $152,514 |
| 2/16/2021 | 200 | $723.64 | $144,728 |
| 5/17/2021 | 200 | $714.96 | $142,992 |
| 8/16/2021 | 200 | $814.70 | $162,940 |
| 11/16/2021 | 75 | $798.27 | $59,870 |
| 2/16/2022 | 50 | $677.64 | $33,882 |
| 5/17/2022 | 50 | $651.91 | $32,596 |
| 8/16/2022 | 75 | $705.16 | $52,887 |
| 11/16/2022 | 50 | $658.69 | $32,935 |
| 2/16/2023 | 75 | $707.75 | $53,081 |
| 5/16/2023 | 75 | $738.20 | $55,365 |
| 8/16/2023 | 75 | $760.19 | $57,014 |
| 11/17/2023 | 75 | $786.56 | $58,992 |
| 2/16/2024 | 100 | $863.49 | $86,349 |
| **Total:** | **2,700** | | **$1,858,403** |

199. Defendant Hromadko's sales during the Relevant Period were as follows:

| Date of Sale | Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 11/6/2020 | 10000 | $790.17 | $7,901,700.00 |

[9] An additional 75 shares were sold by the Paisley Living Trust of Christopher B. Paisley, Trustee, during the class period for proceeds of 58,992.

| | | | |
|---|---|---|---|
| 6/7/2021 | 10000 | $796.00 | $7,960,000.00 |
| 9/1/2021 | 7800 | $855.00 | $6,669,000.00 |
| 12/7/2023 | 1902 | $811.68 | $1,543,815.36 |
| **Total:** | **29,702** | | **$24,074,515.36** |

## DAMAGES TO THE COMPANY

200. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Equinix has sustained and will continue to sustain significant damages.

201. Equinix has paid $41.5 million to settle the Securities Class Action, which alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 based on false and misleading statements regarding AFFO, CapEx classification, and power capacity overselling, causing substantial financial harm to the Company under Delaware law, where directors and officers owe duties of loyalty and care to prevent such wasteful expenditures.

202. Equinix has incurred and will continue to incur significant legal fees and expenses in defending the Securities Class Action, this derivative action, and related internal investigations by the Audit Committee, constituting corporate waste and harm recoverable in a derivative suit, as these costs stem from the Individual Defendants' breaches of fiduciary duties in failing to oversee accurate financial reporting and compliance.

203. The Company faces ongoing government investigations, including subpoenas issued in 2024, which have required and will require substantial expenditures for legal counsel, document production, and potential fines or penalties, representing direct harm to Equinix's assets and recoverable under Delaware law for the directors' failure to maintain adequate internal controls and risk oversight.

204. Equinix's stock price suffered significant declines following partial corrective disclosures erasing approximately $10 billion in market capitalization, impairing the Company's

ability to raise capital at favorable terms and causing reputational damage that affects customer trust and future revenue, constituting harm to corporate value. Certain defendants were unjustly enriched through excessive compensation tied to inflated AFFO metrics, totaling approximately $476 million in bonus payouts from 2015-2023 (e.g., Meyers: $106 million; Taylor: $42 million), which would not have been achieved without their fraudulent scheme.

205. Insider trading by the Individual Defendants misappropriated the Company's material non-public information, harming the Company's integrity and shareholder value. This non-public, proprietary information concerning the Company's true financial condition was an asset belonging to the Company, which the Individual Defendants who sold shares during the Relevant Period misappropriated for their own personal financial benefit at the expense of Equinix.

206. Equinix conducted stock offerings totaling over $4.5 billion at artificially inflated prices during the Relevant Period, exposing the Company to rescission risks, clawback claims, and regulatory scrutiny, which has led to indirect harms such as increased borrowing costs and diluted shareholder equity.

207. The Company incurred costs for an internal Audit Committee investigation into the Hindenburg Report allegations, including potential consultant and advisor fees, directly attributable to the Individual Defendants' oversight failures and constituting corporate waste.

208. Reputational damage from the allegations of accounting manipulation eroded investor confidence, potentially increasing the cost of capital, hindering partnerships and reducing revenue growth opportunities, as evidenced by analyst downgrades and stock volatility, harming Equinix's long-term value.

209. Equinix faces potential tax liabilities or REIT status challenges if the CapEx misclassifications are deemed to violate IRS guidelines for REIT qualification, risking

disqualification and back taxes, which would cause severe financial harm recoverable for the directors' breaches of care in financial reporting.

210. The breaches have led to employee morale issues, potential talent retention problems, and increased compliance training costs, as the Company must remediate internal controls deficiencies identified in the investigations, representing ongoing operational harm. Indeed, the Hindenburg Report details widescale employee dissatisfaction associated with compelling employees to take steps to misclassify CapEx.

**BREACHES OF DUTIES**

211. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Equinix, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

212. The Individual Defendants breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Equinix substantial damage.

213. The members of the Audit Committee had a duty to review the Company's earnings press releases and regulatory filings. They breached their duty of loyalty and good faith by approving the omission of material information, making improper statements detailed herein, and failing to properly oversee Equinix's public statements and internal control functions.

214. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Equinix, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual

Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Equinix has expended and will continue to expend significant sums of money.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

215. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

216. Equinix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

217. Plaintiff is a current stockholder of Equinix and was a continuous stockholder of the Company during the Relevant Period. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

218. A pre-suit demand on the Board of Equinix is futile and, therefore, excused. At the time this action was commenced, Board was comprised of eight members: Defendants (i) Meyers, (ii) Fox-Martin, (iii) Caldwell, (iv) Hromadko, (v) Olinger, (vi) Paisley, (vii) Rivera, and (viii) Russo (the "**Demand Board**"). Accordingly, Plaintiff is only required to show that four members of the Demand Board cannot exercise independent and disinterested business judgment about whether to bring this action. As set forth below, all the current members of the Demand Board are incapable of making an independent and disinterested decision to institute this action, thus excusing demand.

219. The Demand Board either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

220. Each member of the Demand Board approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

221. Moreover, the Demand Board willfully ignored, or recklessly failed to inform themselves of, the glaring problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

222. Defendant Fox-Martin serves as the Company's President and CEO, is not disinterested or independent, and is therefore incapable of considering a demand. She has been a member of the Board since 2020. Moreover, the Company admits that she is a non-independent director.

223. Defendant Meyers is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period. As set forth in the 2024 Proxy, the Company admits that Meyers is not an independent director and is therefore incapable of considering a demand. Moreover, Meyers is interested because he received a material personal benefit from the alleged misconduct, reaping over $107 million from insider trades during the Relevant Period. These trades occurred while the Company's stock was artificially inflated based on the

misrepresentations set forth above. Additionally, Meyers faces a substantial likelihood of liability for the claims herein.

224. Defendants Paisley, Olinger, and Russo serve or served on the Company's Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, inter alia, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duties by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, these defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

225. Demand as against Paisley is further excused because he received material personal benefit from the alleged misconduct, reaping over $1.8 million from insider trades which he authorized based on material non-public information that he possessed about the Company, including the misclassification of Recurring CapEx as Non-Recurring CapEx. His trades were timed during periods of artificial inflation caused by the scheme. Paisley also faces a substantial likelihood of liability as Chair of the Audit Committee, where he reviewed and approved financial reports and presentations detailing AFFO, CapEx classifications, and REIT compliance that contained manipulated metrics, failed to oversee adequate internal controls over CapEx classification, and certified false financial statements and proxies (e.g., the 2023 Proxy omitting the scheme).

226. Demand is futile as to Defendant Hromadko because he received material personal benefit from the alleged misconduct, reaping over $24 million from insider trades. These trades capitalized on the scheme's inflation of stock prices. Hromadko also faces a substantial likelihood of liability as Chair of the Finance and Real Estate Committees, where he oversaw capital allocation, REIT compliance, and financial planning (*e.g.*, reviewing AFFO and CapEx in board materials), yet failed to address the manipulations.

227. Demand is futile as to Defendant Olinger because he faces a substantial likelihood of liability on the claims. As a member of the Audit Committee, Olinger reviewed and approved quarterly and annual financial reports that overstated AFFO through improper CapEx classifications (e.g., presentations detailing CapEx trends, AFFO calculations, and REIT asset tests), failed to ensure effective internal controls over financial reporting despite red flags like declining recurring CapEx amid growth, and certified misleading proxies (e.g., the 2023 Proxy omitting the scheme).

228. Demand on Defendant Caldwell is futile because she faces a substantial likelihood of liability on the claims. She signed false proxies (e.g., 2023 Proxy) that omitted the scheme, misrepresented performance metrics, and justified excessive payouts, exposing her to a substantial likelihood of liability. Caldwell also lacks independence from Meyers because her committee directly oversaw and approved his compensation tied to the fraudulent AFFO, creating a disabling entanglement with the primary wrongdoers.

229. Demand on Defendant Russo is futile because she faces a substantial likelihood of liability on the claims. As a member of the Audit Committee since 2022, Russo reviewed and approved financial reports and presentations that perpetuated the misclassification of CapEx (*e.g.*, 3Q22 and 1Q23 Audit Committee materials detailing AFFO calculations and REIT compliance

reliant on manipulated metrics), failed to remediate known deficiencies in internal controls over financial reporting despite red flags like inconsistent CapEx trends, and signed the false 2023 Proxy that omitted the ongoing scheme inflating AFFO by approximately $191 million in 2023.

230. Demand on Defendant Rivera is futile because she faces a substantial likelihood of liability on the claims. As a member of the Compensation Committee since at least 2019 and Chair since at least May 2023, Rivera reviewed and approved executive compensation plans heavily reliant on AFFO/Share targets (50% weighting in annual incentives) which were achieved through the CapEx misclassifications inflating AFFO by $729 million (2019-2023), leading to excessive payouts. She signed false proxies (*e.g.*, 2023 Proxy) that omitted the scheme and misrepresented performance. Rivera also lacks independence from Meyers because her committee directly determined and approved his compensation linked to the fraudulent AFFO, creating a compromising tie to the primary wrongdoers.

231. The members of the Demand Board, as Company directors, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The members of the Demand Board violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Accordingly, they face a substantial likelihood of liability for breaching their fiduciary duties and therefore demand upon them is futile.

232. Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

233. Thus, for all of the reasons set forth above, all of Equinix's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CAUSES OF ACTION

## COUNT I

**Against the Individual Defendants**
*for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)*
*and Rule 14a-9 (17 C.F.R. § 240.14a-9)*

234. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

235. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

236. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

237. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose, inter alia, that: (i) though the Company claimed its officers and

directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (ii) contrary to the Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

238. The Proxy Statements also failed to disclose, inter alia, that: (i) that the Company overstated AFFO (and AFFO/Share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

239. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

240. The misrepresentations and omissions in the Proxy Statements were material to Company stockholders in voting on the matters set forth for stockholder determination in the Proxy Statements, including but not limited to the reelection of certain Director Defendants. The 2020 Proxy was an essential link in Defendants' insulation from stockholder challenge.

241. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statements

242. Plaintiff, on behalf of Equinix, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants**
*for Breaches of Fiduciary Duty*

243. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

245. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

246. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

247. Specifically, the Individual Defendants failed to disclose that: (i) the Company overstated AFFO (and AFFO/Share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

248. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

249. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

250. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages and the Individual Defendants are liable to the Company.

251. Plaintiff, on behalf of Equinix, has no adequate remedy at law.

**COUNT III**

**Against Defendants Meyers, Taylor, Van Camp, Paisley, and Hromadko**
*for Insider Trading*

252. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

253. As alleged above, Defendants Meyers, Taylor, Van Camp, Paisley, and Hromadko are Equinix's fiduciaries, and possessed the Company's material non-public information, and used that information to improperly profit from sales of Equinix stock. These defendants directed their stock sales set forth above due in whole or in part to their knowledge of the substance of the material non-public information in their possession.

254. These defendants knew that the investing public was unaware of the negative material information which these defendants possessed when they sold their Equinix stock. They also knew that if the information were disclosed, the market price of Equinix stock would be significantly lower. These defendants timed their stock sales to take advantage of the public's ignorance of the concealed facts and obtain a higher price for the stock they sold, thus benefiting by misappropriating the Company's confidential information.

255. Plaintiff, on behalf of Equinix, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants**
*for Unjust Enrichment*

256. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Equinix.

258. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Equinix that was tied to the performance or artificially inflated valuation of Equinix, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

259. Plaintiff, as a shareholder and a representative of Equinix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

260. Plaintiff, on behalf of Equinix, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

B. Finding that the Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, breached their fiduciary duties to Equinix, and were unjustly enriched;

C. Finding that Defendants Meyers, Taylor, Van Camp, Paisley, and Hromadko sold shares of Equinix stock on the basis of their knowledge of materially adverse non-public and confidential financial information about the Company, which they learned as a result of their positions as directors and/or officers of the Company and/or as members of committees of the Board;

D. Awarding Equinix the damages that it sustained as a result of the Individual Defendants' misconduct;

E. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and;

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

*Of Counsel:*

**LEVI & KORSINSKY, LLP**
Gregory Mark Nespole
Daniel Tepper
Correy A. Suk
33 Whitehall Street, 27th Floor
New York, NY 10004
(212) 363-7500
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

**LONGMAN LAW, P.C.**
Howard T. Longman
354 Eisenhower Pkwy., Suite 1800
Livingston, New Jersey 07039
(973) 994-2315
Hlongman@longman.law

**ASHBY & GEDDES, P.A.**

*/s/ Tiffany Geyer Lydon*
Stephen E. Jenkins (#2152)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302) 654-1888
sjenkins@ashbygeddes.com
tlydon@ashbygeddes.com

*Attorneys for Plaintiff*

Dated: August 6, 2025